

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNDER SEAL,<br><br>Plaintiffs,<br><br>vs.<br><br>UNDER SEAL,<br><br>Defendants. | ) Case No.:     10-1520<br>)<br>) FIRST AMENDED COMPLAINT FOR<br>) VIOLATIONS OF FALSE CLAIMS<br>) ACTS 31 U.S.C. §§ 3729, *et seq.*<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>) **FILED UNDER SEAL**<br>) **PURSUANT TO 31 U.S.C. §§**<br>) **3730(b)(2) and (3)**<br>) |



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES of AMERICA *ex rel.* ERIC JOHNSON,<br><br>Plaintiffs,<br><br>vs.<br><br>INDEPENDENCE BLUE CROSS,<br><br>Defendant. | ) Case No.: 10-1520<br>)<br>) FIRST AMENDED COMPLAINT FOR<br>) VIOLATIONS OF FEDERAL FALSE<br>) CLAIMS ACT<br>) 31 U.S.C. §§ 3729, *et seq.*<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>) **FILED UNDER SEAL**<br>) **PURSUANT TO 31 U.S.C. §§**<br>) **3730(b)(2) and (3)** |

FILED
OCT 28 2011
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

COMES NOW *QUI TAM* RELATOR-PLAINTIFF Eric Johnson, suing for himself and for the United States of America, pursuant to 31 U.S.C. § 3730 *et seq*, and alleges as follows:

1. This action is based upon two separate frauds committed by the defendant.

2. The first allegation is based on the defendant's submission of false claims in connection with its inflated financial bids for Medicare Advantage plans. The defendant accomplished this by falsely inflating its claim cost experience in the financial bids submitted in June 2008 for its 2009 contract year, and again in June 2009 for its 2010 contract year. These inflated claim cost experience numbers resulted in higher payment base amounts in the defendant's Medicare Advantage bids, resulting in at least $20 million in inflated premiums being paid by the United States to the defendant, causing damages to the United States in the millions of dollars. Defendant's conduct is a violation of both former statutes 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(7), and current statutes 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G).

3. The second allegation is based upon the defendant knowingly covering up and avoiding its obligation to repay millions of dollars in overpayments mistakenly made by the

United States for Medicare beneficiaries that actually were not participants in the defendant's Medicare Advantage plans and for which the defendant was not entitled to the CMS payments. The defendant has known of this "overpayment issue" as a recurring problem since at least 2007, but has knowingly used false records or statements to conceal, avoid or decrease an obligation to repay overpayments and has knowingly refused to address it and instead has chosen to keep quiet about the money in the hope that it will not get caught. These overpayments amount to at least $35 million. Defendant's conduct is a violation of both former statute 31 U.S.C. § 3729(a)(7) and current statute 31 U.S.C. § 3729(a)(1)(G).

## I. JURISDICTION

4. Jurisdiction over the federal claims asserted herein is based upon federal subject matter pursuant to 31 U.S.C. § 3729 *et seq.*

5. The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a).

## II. VENUE

6. Venue is proper in the Eastern District of Pennsylvania, under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because the defendant transacts business in this District and because the defendant committed acts within this district that violated 31 U.S.C. § 3729.

## III. PARTIES

7. *Qui tam* plaintiff Eric Johnson is a lead actuarial analyst in the employee of defendant Independence Blue Cross. Mr. Johnson resides in the Eastern District of Pennsylvania.

8. The United States of America, through the Center for Medicare and Medicaid Services, has provided funds for the false claims at issue herein.

9. Defendant Independence Blue Cross ("IBC") is a Pennsylvania insurance company

headquartered in Philadelphia, Pennsylvania. As part of its lines of business, IBC operates as a Medicare Advantage Organization and offers various Medicare Advantage plans to Medicare beneficiaries, receiving hundreds of millions of dollars in payments from Medicare.

## IV. The Medicare Program

10. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain health care services. The Medicare Program is a federally funded program designed to primarily provide health care benefits to the aged. Part A of the Medicare Program authorizes payment for institutional care, including inpatient hospital care and related services. *See* 42 U.S.C. §§ 1395c-1395i-5. Part B of the Medicare Program authorizes payment for physician services and other non-institutional medical services. *See* 42 U.S.C. §§ 1395j–1395w-20.

11. HHS is generally responsible for the administration and supervision of the Medicare Program. CMS, a component of HHS, is directly responsible for the administration of the Medicare Program. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries," typically insurance companies, who are responsible for processing and paying claims and auditing cost reports. 42 U.S.C. § 1395h. Similarly, CMS contracts with "carriers" to assist in the administration of Medicare Part B. 42 U.S.C. § 1395u.

12. Entities that submit claims to Medicare have a legal duty to familiarize themselves with Medicare's payment rules, including those stated in the Medicare Manuals. *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 64-65 (1984). A provider's failure to inform itself of the legal requirements for participation in the program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims or certifications in question, under the False Claims

Act. *United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001).

13. Entities submitting claims to Medicare are required to disclose all known errors and omissions in their claims. 42 U.S.C. § 1320a-7b(a) states in part:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall . . . be guilty of a felony. . . .

### V. Medicare Advantgage

14. **General Description**. Medicare has a standard benefit package that covers medically necessary care through plans offered by private insurers. This is known as the Medicare Advantage program. Medicare Advantage plans operate under Medicare Part C. Additionall, Medicare Advantage Plans that also include Part D prescription drug benefits are known as a Medicare Advantage Prescription Drug plan and operate under Medicare Part D. For eas of reference, both the Part C Plans and the Part D plans are referred to in this Complaint as "Medicare Advantage plans."

15. For people who choose to enroll in a Medicare Advantage private health plan, Medicare pays the private health plan a set amount every month for each member, based on each enrolled member's individual Risk Score. Members may have to pay a monthly premium in addition to the Medicare Part B premium and generally pay a fixed copayment every time they receive a service or prescription drug. Medicare Advantage plans are required to offer a benefit "package" that is at least as good as Medicare's and cover everything Medicare covers, but they do not have to cover every benefit in the same way. As an example, plans that pay less than Medicare for some benefits, like skilled nursing facility care, can balance their benefits package by offering lower copayments for doctor visits, or increased benefits in another area, such as

dental benefits.

16. **Calculation of Medicare Payments**. Medicare pays Medicare Advantage plans a per member per month ("PMPM") individualized amount based on each enrollee's Risk Score and the resulting estimate of what it will cost to provide the Medicare covered services for that enrollee. The PMPM amount is calculated by comparing a plan's bid – its projection of the revenue it requires to provide a beneficiary with services that would be covered under Medicare Fee For Service, and a "benchmark" -- the maximum amount Medicare will pay the plan to serve an average beneficiary in that geographic area. Medicare Advantage plans submit their bids in June of each year, based on their actual claims cost experience from the prior year. The June bid is then used to calculate the Medicare payment structure for the upcoming year.

17. If the plan's bid is higher than the "benchmark", Medicare pays the plan the amount of the benchmark, and the plan must charge beneficiaries a premium to collect the amount by which the bid exceeds the benchmark. If the plan's bid is lower than the benchmark, Medicare pays the plan the amount of the bid and makes an additional rebate payment to the plan equal to 75 percent of the difference between the benchmark and the bid. Plans are required to use the rebate to provide their beneficiaries with additional benefits beyond those offered in Medicare Fee For Service, reduce premiums, reduce cost sharing, or any combination of the three.

18. The bid pricing data contain the Medicare Advantage plan's projections of its revenue requirements and revenue sources. Specifically, the bid pricing data contain information on the amount of rebates and additional premiums the plan projects it will require to fund additional benefits, reduced premiums, and reduced cost sharing. The bid pricing data also contain information about how the plan's projected cost sharing compares to estimates of cost sharing in Medicare Fee For Service and the plan's projections of revenue requirements, including

spending on medical expenses and on non-medical expenses (such as marketing, sales, and administration), and the Medicare Advantage organization's margins.

19.  **Certification of Bid Proposals**.  The Medicare Advantage Organization's chief executive officer ("CEO"), chief financial officer ("CFO"), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) that the information in its bid submission is accurate, complete, and truthful and fully conforms to the bid proposal requirements.  This attestation requirement is applicable to all Medicare Advantage contractors, including those that are nonrenewing or terminating their contracts.

20.  **Certification of Monthly Data**.  Additionally, as a condition for receiving a Medicare Advantage monthly payment from CMS for each enrolled member, the Medicare Advantage Organization, through its CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on a document that attests to the fact that each enrollee for whom the organization is requesting payment is validly enrolled in an Medicare Advantage plan offered by the organization, and the information relied upon by CMS in determining payment is accurate, complete, and truthful.  Such data include specified enrollment/disenrollment information, changes in benefit packages, and other information that CMS may specify.

21.  As an additional condition of payment, the Medicare Advantage Organization must also certify that it has examined the CMS "monthly membership report and reply listing" for each Medicare Advantage plan and that it has submitted requests to Medicare's Program Safeguard Contractor for retroactive adjustments to correct payment data when the Medicare Advantage


Organization has more accurate information. This certification is the implementation of the Medicare Advantage Organization's responsibility to ensure that CMS is paying for all of the actual members on the Organization's Medicare Advantage roles, but <u>only</u> for people who are actually such members. CMS relies on this certification that the CMS roles of the Medicare Advantage beneficiaries for the Medicare Advantage Organization are accurate and that the CMS payment to the Medicare Advantage Organization for each such enrolled beneficiary is correct.

22.  The monthly certification is set forth below:

<u>Certification Of Monthly Enrollment and Payment Data Relating to CMS Payment to a Medicare Advantage Program</u>

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (<u>NAME OF MEDICARE ADVANTAGE ORGANIZATION</u>), hereafter referred to as the "MA Organization," governing the operation of the following Medicare Advantage plans (<u>PLAN IDENTIFICATION NUMBERS</u>), the MA Organization hereby requests payment under the contract, and in doing so, makes the following certifications concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization and that misrepresentations and omissions to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution. This certification shall not be considered a waiver of the MA Organization's right to seek payment adjustments from CMS based on information or data which does not become available until after the date the MA Organization submits this certification.

1. The MA Organization has reported to CMS for applications received in the

month of (<u>MONTH AND YEAR</u>) all new enrollments, disenrollments, and changes in Plan Benefit Packages, as well as those beneficiaries who have met the qualifying institutional period with respect to the above-stated MA plans. Based on best knowledge, information, and belief, all information submitted to CMS in this report is accurate, complete, and truthful.

    2. The MA Organization has reviewed the CMS monthly membership report and reply listing for the month of _____ (MONTH AND YEAR) for the above-stated MA plans and has submitted requests to the IntegriGuard, under separate cover, for retroactive adjustments to correct payment data when the MA Organization has more accurate information. This may include enrollment status, working aged status, institutional status, Medicaid status, and State and County Code related to specific beneficiary.

For those portions of the monthly membership report and the reply listing to which the MA Organization raises no objection, the MA Organization, through the certifying CEO/CFO, will be deemed to have attested, based on my best knowledge, information, and belief, to their accuracy, completeness, and truthfulness.

                                                            _____
                                                             NAME
                                                             TITLE
                                                            on behalf of

                                                            _____
                                                            (MA Organization)

## VI.  Defendant's Misconduct

    23.    Defendant IBC failed to comply with CMS monthly membership reconciliation requirements in at least 2006 through 2011, although it falsely certified each month to CMS that it 1) had done so and 2) had notified CMS of any discrepancies. This has resulted in a disconnect

between the CMS list of members CMS tracked for IBC's Medicare Advantage plans, and the IBC list of members IBC knew it actually had in its plans. This discrepancy resulted both in approximately $25 million in <u>underpayments</u> from CMS for a pool of actual IBC Medicare Advantage members of whom CMS was not aware, and also at least $35 million in <u>overpayments</u> from CMS for another pool of people CMS thought were IBC Medicare Advantage members, but who were not actually on IBC's member roles.

### A. FIRST ALLEGATION: IBC'S FRAUD TO "DOUBLE DIP" FOR THE $25 MILLION IN UNDERPAYMENTS BY FALSELY INFLATING ITS CONTRACT BIDS.

24. <u>The plan to opt for self-help</u>. During the first few months of 2008, IBC began holding meetings where management within the compliance department discussed these underpayments and overpayments and decided not to immediately inform CMS of the member reconciliation discrepancies. Instead, management decided to inflate the 2007 per-member claim cost experience in the financial bids IBC submitted in June 2008 for contract year 2009 rates, to recoup the underpayments portion from CMS. By inflating the per-member claims cost, IBC would have a higher bid amount (or payment base amount) in the calendar year 2009 and would ultimately receive inflated revenues from CMS.

25. In preparing the bid sheets, a calculation is made to determine the cost per member per month. This calculation requires taking the actual incurred costs and dividing it by the actual number of "member months" in each plan. However, IBC intentionally used a smaller number of member months in several of its plans, so that the resulting calculation of "cost per member month" was falsely inflated. (Spreading the actual costs across a fewer number of members, results in an inflated amount of cost per member per month.)

26. To accomplish this falsely inflated calculation, IBC internally knew it had a greater

number of members "lives" than CMS knew about, because of IBC's previous failure to comply with CMS monthly membership reconciliation requirements in 2006 and 2007. Rather than correctly calculate its cost per member month by using the actual number of member "lives", IBC decided to prepare its bid sheet calculations using the incorrect lower number of member "lives" that it knew CMS incorrectly tracked for the plans and, in several cases, even used a lower number of member "lives" than CMS tracked for the plan.

27. When the qui tam plaintiff Eric Johnson complained that this approach would artificially inflate the calculation of claims cost per member, he was told by the Manager of Actuarial Services, Bill Smith, that this was the approach management decided to take to recoup lost premiums as a result of the earlier membership discrepancy error.

28. The false bid sheets for the year 2009 contracts were falsely certified as accurate, complete and truthful by IBC Senior Vice President Kathy Galarneau, who reports directly to CFO John Foos, who reports directly to CEO Joseph Frick. As a result of these falsely certified bid sheets, CMS was caused to make inflated premium payments every month for every member in 2009.

29. **The plan to also ask for retroactive payment adjustments while keeping the "self-help" illicit payments**.   In late 2008 or early 2009, after it had submitted the inflated June 2008 bids, IBC decided to also contact CMS concerning the IBC enrolled members of whom CMS was previously unaware and for whom CMS had not made Per Member Per Month payments (e.g. - the "underpayments" issue). IBC hired an outside consultant, The Gorman Group, to assist in seeking these retroactive payments for the actual IBC enrollees of whom CMS was previously unaware. By March 2009, IBC had not yet successfully obtained reimbursement from CMS for these members. So, once again, IBC decided to use an incorrectly low number of

member "lives" in the upcoming bids to be submitted in June 2009, so that it would continue to receive inflated premium payments through 2010. The qui tam Plaintiff Eric Johnson again complained to his boss, Bill Smith, notifying him of Mr. Johnson's concerns about this approach. Bill Smith verbally responded again, as he had the year before, repeating the self-help rationale for recouping prior underpayments from CMS.

30. In October 2009, CMS reached a decision to begin reimbursing IBC for approximately $25 million of lost premium payments for the actual IBC enrolled members of whom CMS had been previously unaware. Those $25 million in payments came into IBC from CMS in December 2009 through April 2010. However, IBC has additionally kept more than $20 million it gained in falsely inflated payments from its illicit "self-help" measures in its falsified financial bids for the 2009 and 2010 contract years.

31. As discussed above, if a plan's bid is lower than the "benchmark", Medicare pays the plan the amount of the bid. The difference between the bid and the benchmark is known as the "savings". Medicare pays 75 percent of the savings to the plan as a rebate to be used for additional member services, and retains the remaining 25 percent of the savings for the Medicare Program. IBC's falsely inflated "per member per month" costs pertained to several plans where the bid ended up being lower than the "benchmark". As a result, CMS made rebate payments to IBC for those plans in amounts equal to 75 percent of the difference between the "benchmark" and the (falsely inflated) bids. Thus, IBC siphoned off a portion of the savings that would have been realized by the Medicare Program had IBC not inflated the per-member claim costs. Were it not for IBC's false inflation of the costs in those bids, CMS would have allocated more than $15 million in rebates for additional member services and retained more than $5 million in savings for the Medicare Program thus far in 2009 and 2010.

32. **False Certification of Monthly Enrollment and Payment Data.** In addition to falsely certifying its annual bids, IBC also knowingly falsely certified its Monthly Enrollment and Payment Data each and every month in 2007 and through at least 2011.

33. By submitting false claims for payment for all members, based on these false certifications for bids and Monthly Enrollment and Payment Data, and also keeping the overpayments made by CMS, IBC has violated the Federal False Claims Act and caused damages to the United States in the millions of dollars.

## B. SECOND ALLEGATION: IBC'S FRAUD TO HIDE AND AVOID REPAYMENT TO CMS OF $35 MILLION IN OVERPAYMENTS.

34. As IBC was examining the disconnect between who CMS thought IBC had as members and who IBC actually had as members, IBC realized that there were not only <u>underpayments</u> at issue for the pool of IBC members that CMS previously did not know about, but also that it was receiving <u>overpayments</u> from CMS for another large pool of people CMS thought were on IBC's member roles, but who actually were not. However, rather than address these CMS <u>overpayments</u> as it was making a claim for the CMS <u>underpayments</u>, IBC decided to stay quiet and do nothing about the <u>overpayments</u>.

35. Beginning in 2007, the relator Eric Johnson was in meetings with various IBC management personnel to discuss how to address the member discrepancy issues via a reconciliation. In these meetings it was acknowledged that the member discrepancies not only resulted in millions of dollars in <u>underpayments</u> from CMS (for which IBC has now made a $25 million claim and received the funds), but also resulted in <u>overpayments</u> from CMS. However, a decision was reached by IBC management Steve Fera (Senior Vice President, Public Affairs) to only address a resolution of the $25 million <u>underpayments</u> issue with CMS, and to not address

any <u>overpayments</u> IBC had received from CMS. Additional IBC personnel who discussed the fact of the <u>overpayments</u> included at various times Mark Cary (Director of Actuarial services), Bill Smith, (Manager of Actuarial Services), Julia Hartnet (AEDW Manager), Christopher Simpkons (AEDW Manager) and Andre McDonald (IT programmer).

36.     After ignoring the overpayments issue for almost four years, in early 2011, IBC's internal computer system (Active Enterprise Data Warehouse "AEDW") was finally used by IBC to do a "matching" to see exactly which CMS payment records had a match to IBC's actual member roles and exactly which CMS payments were, in fact, overpayments because they had been made for people who were not IBC members. From this process, it was again discussed in various meetings that CMS had been making overpayments to IBC for people who were not actually on IBC's roles. However, in these same meetings, it was again decided not to address this overpayment issue. To Eric Johnson's belief, these overpayments are at least $35 million, but IBC still has knowingly refused to address the overpayments with the United States and has continued to falsely certify every month that this has examined the CMS monthly "membership report and reply listing" for each Medicare Advantage plan and falsely certify that it has notified CMS for retroactive adjustments to correct the payment data.

37.     By falsely certifying every month that it has examined the CMS monthly "membership report and reply listing" for each Medicare Advantage plan and falsely certifying that it has notified CMS for retroactive adjustments to correct the payment data, and by knowingly avoiding its obligation to address and repay <u>overpayments</u> mistakenly made by the United States for Medicare beneficiaries that were not actually participants in the defendant's Medicare Advantage plans, IBC has violated the Federal False Claims Act and caused damages to the United States in the millions of dollars.

## VII. COUNT ONE
(For Violation of 31 U.S.C. § 3729 et seq.)

38. *Qui tam* plaintiffs hereby reallege and incorporate herein by this reference paragraphs 1 through 37, inclusive, hereinabove, as though fully set forth at length.

39. Through its conduct as set forth above, IBC has violated, and continues to violate, former statutes 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(7), and current statutes 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G). As a result of such knowing wrongful conduct, IBC has caused damages to the United States in millions of dollars.

WHEREFORE, *qui tam* plaintiff prays for relief as follows:

1. Full restitution to the United States of all money damages sustained by it;

2. For three times the dollar amount proven to have been wrongfully paid by or withheld from the United States;

3. For maximum civil penalties for all false records, statements, certifications and claims submitted to the United States;

///

///

///

///

///

///

///

///

///

4.  For costs of suit, reasonable attorney's fees and the maximum relator share; and

5.  For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby request a jury trial.

Respectfully Submitted,

FILED
OCT 28 2011
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

Dated: October 27, 2011

*Donald R. Warren*

Donald R. Warren (*pro hac vice*)
7825 Fay Ave., Ste. 200
La Jolla, California  92037
ph - (858) 454-2877   fax - (858) 454-5878

James J. West  (PA Bar No. 00331)
105 North Front Street, Suite 205
Harrisburg, PA 17101
ph - (717) 233-5051   fax - (717) 234-7517

Counsel for *qui tam* plaintiff Eric Johnson

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to the following via first class mail on 27th day of October, 2011.

Viveca Parker, AUSA
U.S. Attorney Office
615 Chestnut Street
Philadelphia, PA 19106

Mary Crawley, AUSA
U.S. Attorney Office
615 Chestnut Street
Philadelphia, PA 19106

Patricia Hanower
U.S. Department of Justice
Civil Division
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044

*Donald R. Warren* (signature)

FILED
OCT 28 2011
MICHAEL P. CUNZ, Clerk
By _____ Dep. Clerk